**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | |
|---|---|
| JEFFEREY KING, Individually And On Behalf of All Others Similarly Situated | Case No.: |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| NATIONSBENEFITS LLC, NATIONSBENEFITS HOLDINGS LLC, and AETNA, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff, Jefferey King, individually and on behalf of all persons similarly situated (the "Class" or the "Class Members"), by and through his undersigned counsel, brings this class action complaint ("Complaint") against Defendants NationsBenefits LLC and NationsBenefits Holdings LLC ("NationsBenefits") and Aetna Inc. (collectively, "Defendants"). Plaintiff makes the following allegations based upon personal knowledge with respect to themselves, and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters.

## NATURE OF THE CASE

1.      Plaintiff brings this Complaint against Defendants for their failure to adequately and properly secure and safeguard patients' personally identifiable information ("PII") and protected health information ("PHI"), and for failing to provide timely, accurate and adequate notice to Plaintiff and the Class Members that their PHI and PII had been compromised in an attack orchestrated by cybercriminals.

2.      NationsBenefits was founded in 2015 and holds itself out as a "leading provider of supplemental benefits, flex cards, and member engagement solutions for health plans." The company has been touted as an emerging leader in the benefits administration space and has been recognized as "one of the fastest growing companies in the U.S." by Inc. Magazine for three years in a row.

3.      NationsBenefits partners with several health benefits providers, including Aetna, to administer supplemental health benefits programs to individuals insured by the providers. By nature of its services as a benefits administrator, NationsBenefits has directly and indirectly collected sensitive information from its partners and the customers of its partner organizations for years, including, but not limited to, names, social security information, and health insurance information.

4.      Starting on or about April 13, 2023, NationsBenefits sent Plaintiff and Class Members a notice informing them that its computer systems had been breached and customer data accessed by a cybercriminal (the "Data Breach").

5.      The data involved included PHI and PII such as names, gender, addresses, telephone numbers, birth dates, Social Security numbers, health insurance information, Medicare/Medicaid ID numbers, and group plan names and numbers.

6.      According to the notice sent by NationsBenefits to Plaintiff and the Class Members, the Data Breach occurred on or around January 30, 2023. Although NationsBenefits learned of the breach in early February 2023, it only began to inform affected consumers and the Class Members ***more than two months later***, on April 13, 2023.

7.      In April 2023, NationsBenefits finally disclosed the scope of the Data Breach. NationsBenefits reported to the U.S. Department of Health and Human Services that 3,037, 303

members were affected by the breach. In fact, the attack on NationsBenefits is listed among the biggest data breaches affecting the healthcare industry in the first half of 2023.[1]

8.      The Data Breach occurred and was amplified by Defendants' negligent failure to (i) implement reasonable and adequate security procedures and practices, (ii) disclose material facts surrounding their deficient data security protocols, and (iii) timely notify the victims of the Data Breach.

9.      As a result of Defendants' failure to protect the sensitive PHI and PII they were entrusted to safeguard, Plaintiff and the Class Members have suffered harm and have been exposed to a significant and continuing risk of identity theft, financial fraud, and other fraud for years to come.

## **PLAINTIFF**

10.     Plaintiff Jefferey King is a resident and citizen of Toledo, Ohio.

11.     King's Medicare benefits are administered by Aetna, and he receives additional supplemental benefits through the NationsBenefits system.

12.     On or around December 31, 2022, King created an account with NationsBenefits to access several over-the-counter benefits offered through the NationsOTC program.[2]  In order to create a NationsBenefits account, King entered his PII, including his name, social security number, and Member ID number. Upon information and belief, NationsBenefits acquired additional PHI and PII for King from Aetna.

---

[1] *Biggest Healthcare Data Breaches Reported This Year, So Far*, HEALTH IT SECURITY, https://healthitsecurity.com/features/biggest-healthcare-data-breaches-reported-this-year-so-far.

[2] The NationsBenefits website describes the NationsOTC program as such: "NationsOTC provides over-the-counter benefit administration services to health plans seeking an affordable, comprehensive solution in supplemental OTC services and product fulfillment."

13.     Around late April of 2023, King was notified by NationsBenefits that he was a victim of the Data Breach. King recalls that NationsBenefits' notice failed to disclose the full scope of the information compromised in the Data Breach, including the important fact that his Social Security information was stolen by the hackers.

14.     From early February 2023 onwards, King noticed an uptick in phishing and spam phone calls, texts, and emails. Furthermore, King currently has Identity Shield protection, and since the Data Breach occurred, he has observed through this service that several unauthorized transactions were unsuccessfully attempted in his name and that several unauthorized accounts were thwarted. King believes that the uptick in fraudulent and spam activity is a direct result of the Data Breach.

15.     Given the highly sensitive and confidential nature of the PHI and PII stolen in the Data Breach, King remains worried that his information will continue to be used for a variety of fraudulent purposes.

## **DEFENDANTS**

16.     Defendant NationsBenefits, LLC is a private, limited liability company headquartered at 1801 NW 66th Avenue, Suite 100, Plantation, Florida 33313. NationsBenefits is a healthcare benefits company that provides supplemental benefits administration services to healthcare plans and managed care organizations, including Aetna, Inc. NationsBenefits acquired, utilized, and stored the PHI and PII of Plaintiff and the Class Members.

17.     Defendant NationsBenefits Holdings, LLC is a limited liability company organized under Delaware law and headquartered at 1801 NW 66th Avenue, Suite 100, Plantation, Florida 33313.

18.     Defendant Aetna, Inc. ("Aetna") is headquartered at 151 Farmington Avenue, Hartford, CT 06156. Aetna, Inc. is a managed health care company that sells traditional and consumer-directed health care insurance and related services, primarily through employer-paid benefits programs and Medicare. Aetna provides services to about 39 million people, and it is one of the largest benefits providers in the U.S.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because at least one member of the putative Class, as defined below, is a citizen of a different state than NationsBenefits, there are more than 100 putative Class Members, and the amount in controversy exceeds $5 million, exclusive of interests and costs.

20.     This Court has general personal jurisdiction over NationsBenefits because it maintains its principal place of business in Plantation, Florida, regularly conducts business in Florida, and has sufficient minimum contacts in Florida, such as to not offend notions of fair play and substantial justice.

21.     This Court has personal jurisdiction over Aetna because it is engaged in substantial business in Florida, including contracting to insure persons within the State, and has sufficient minimum contacts in Florida, such as to not offend notions of fair play and substantial justice.

22.     Venue in the Southern District of Florida is proper under 28 U.S.C. § 1391 because NationsBenefits resides in this District, and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, including Defendants collecting and/or storing the PII of Plaintiff and the Class Members.

## FACTUAL ALLEGATIONS

### *The Data Breach*

23.      In the course of providing its supplemental benefits administration services, NationsBenefits both directly and indirectly collected sensitive information from Plaintiff and the Class Members, including their names, dates of birth, health information, social security numbers, and insurance information.

24.      In the course of its partnership with NationsBenefits, Aetna provided the PHI and PII of its customers, including Plaintiff, to NationsBenefits, in order for NationsBenefits to administer its supplemental benefits programs.

25.      NationsBenefits uses a file transfer program supplied by Fortra, LLC ("Fortra")—known as "GoAnywhere MFT"—to facilitate file sharing with its various partners, including Aetna. On or around January 2023, "malicious actor(s)" exploited a zero-day vulnerability—now identified as CVE-2023-0669—to access GoAnywhere's managed file transfer (MFT) software. NationsBenefits was among 130 organizations affected by the attack on Fortra's GoAnywhere MFT systems.[3] The hackers accessed PHI and PII stored in two NationsBenefits MFT servers, including, but not limited to, names, gender, addresses, telephone numbers, birth dates, Social Security numbers, health insurance information, Medicare/Medicaid ID numbers, and group plan names and numbers.

26.      Clop ransomware group, an infamous Russia-linked cybercriminal group with a history of orchestrating cyberattacks against the healthcare sector, has openly taken responsibility for the Data Breach. After exfiltrating sensitive PHI and PII from NationsBenefits'

---

[3] *NationsBenefits Holdings Confirms 3 Milion Reocrd Data Breach,* THE HIPAA JOURNAL, https://www.hipaajournal.com/nationsbenefits-holdings-confirms-3-million-record-data-breach/.

systems, Clop requested a ransom from NationsBenefits to avoid publication of members' sensitive information. Thus far, NationsBenefits has not publicly communicated the amount of ransom requested or its response to the hackers' demand. Because the Data Breach was conducted by known, self-proclaimed ransomware hackers, Plaintiff's and the Class Members' sensitive PHI and PII is in the possession of known bad actors.

27.     In a statement issued by the Clop ransomware group following the attacks, the group admitted that it possessed the capabilities to move laterally through its targets' systems, "but decided against it and only stole the documents stored on the compromised GoAnywhere MFT servers."[4] In other words, this already large-scale cyberattack had the potential to be even more damaging to Plaintiff and the Class Members.

28.     Although the attack occurred on January 30, 2023, NationsBenefits claims that it was first notified of the breach on February 7, 2023 when its "security monitoring team received an alert regarding a potential security event on the impacted MFT server."[5] According to NationsBenefits, upon receiving notice of the Data Breach, it took immediate actions to mitigate the effects of the attack, which included taking the server offline and launching an investigation into the matter. Nonetheless, the significant delay between the cyberattack and NationsBenefits' remedial actions left the PHI and PII of Plaintiff and the Class Members vulnerable to further attack.

29.     NationsBenefits notified its partners, including Aetna, of the Data Breach on February 9, 2023, just a few days after NationsBenefits reportedly discovered the attack.

---

[4] *Clop ransomware claims it breached 130 orgs using GoAnywhere zero-day*, BLEEPING COMPUTER, https://www.bleepingcomputer.com/news/security/clop-ransomware-claims-it-breached-130-orgs-using-goanywhere-zero-day/.
[5] Notice of Data Security Incident Sent to New Hampshire Attorney General John Formella, https://www.documentcloud.org/documents/23783721-nationsbenefits-data-breach-notice.

However, as described below, NationsBenefits only informed impacted members more than two months later.

30.     Notably, news of the breach was first communicated to Fortra's enterprise customers several days before February 7, 2023. On February 2, 2023, security reporter Brian Krebs published the following warning on Mastadon: "GoAnywhere MFT, a popular file transfer application is warning about a zero-day remote code injection exploit."[6] Krebs also posted a security advisory issued by Fortra but visible only to its enterprise account holders warning of a "Zero-Day Remote Code Injection exploit [ ] identified in GoAnywhere MFT."[7] In other words, news of this damaging Data Breach was likely available and accessible to NationsBenefits several days before it claims to have been first notified of the Data Breach.

31.     Despite learning of the Data Breach in or around early February 2023, NationsBenefits only began to inform impacted individuals of the Data Breach on or around April 13, 2023. It stated in its notification to members:

> **What Happened?**
>
> "NationsBenefits used software provided by a third-party vendor, Fortra, LLC ("Fortra"), to securely exchange files with your health plan. On or around January 30, 2023, Fortra experienced a data security incident in which a malicious actor(s) accessed or acquired the data of multiple organizations, including NationsBenefits."

32.     NationsBenefits acknowledged in its notice that various forms of PHI and PII were accessed in the Data Breach, including: "First Name; Middle Initial; Last Name; Gender; Health Plan Subscriber Identification Number; Address; Phone Number; Date of Birth; Medicare

---

[6] *Exploitation of GoAnywhere MFT zero-day vulnerability*, RAPID 7, https://www.rapid7.com/blog/post/2023/02/03/exploitation-of-goanywhere-mft-zero-day-vulnerability/.

[7] *Id.*

8

Number." Noticeably missing from this description is mention of Social Security numbers, which were also allegedly exfiltrated from the compromised MFT servers. Furthermore, given the high level of access Clop ransomware group had into NationsBenefits' servers and systems, additional PHI and PII were likely exposed and exfiltrated from its systems.

33.     To date, NationsBenefits has failed to disclose the root cause of the Data Breach, the vulnerabilities exploited, and why it took more than two months to inform Plaintiff and the Class Members of the Data Breach, each of whom has a vested interest in ensuring that their PHI and PII remains protected.

34.     The scope of the Data Breach is substantial. Nearly two months after the Data Breach, NationsBenefits disclosed to the U.S. Department of Health and Human Services that 3,037,303 health plan members were affected by the Data Breach.[8] Among the 130 companies affected by Clop's mass cyber-attack, NationsBenefits is one of the worst affected entities.[9] In fact, the NationsBenefits breach ranks among one of the "biggest healthcare data breaches reported this year, so far [in 2023]."

35.     As entities that maintain and profit off of individuals' highly sensitive personal information, NationsBenefits and Aetna both acknowledge their obligations under state and federal laws to ensure protection of the PHI and PII of Plaintiff and other Class Members. According to a page titled "Your HIPAA Rights" posted on the NationsBenefits website:

> **OUR RESPONSIBILITIES**
>
> We are required by law to maintain the privacy and security of your protected health information.

---

[8] *NationsBenefits Holdings Confirms 3 Milion Reocrd Data Breach,* THE HIPAA JOURNAL, https://www.hipaajournal.com/nationsbenefits-holdings-confirms-3-million-record-data-breach/.
[9] *Id.*

We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information.

We must follow the duties and privacy practices described in this notice and give you a copy of it.

We will not use or share your information other than as described here unless you tell us we can in writing. If you tell us we can, you may change your mind at any time. Let us know in writing if you change your mind.

36.     NationsBenefits further represents that members' information will only be used

for the following purposes:

**HOW DO WE TYPICALLY USE OR SHARE YOUR HEALTH INFORMATION?**
We typically use or share your health information in the following ways.

**Treat you**
We can use your health information and share it with other professionals who are treating you.
Example: We use health information about you to manage your treatment and services.

**Run our organization**
We can use and share your health information to run our practice, improve your care, and contact you when necessary.
Example: We use health information about you to manage your treatment and services.

**Bill for your services**
We can use and share your health information to bill and get payment from health plans or other entities.
Example: We give information about you to your health insurance plan so it will pay for your services.

37.     Aetna similarly assures its customers that any PHI and PII shared with third

parties will be properly safeguarded. Aetna claims "[p]rotecting your privacy is important to

Aetna and we take care to safeguard your personal information."[10] Aetna's "Privacy Center" describes several comprehensive measures the company takes to secure its customers' information in its online "Privacy Center" and makes the claim that Aetna "aim[s] beyond the industry standard" to secure customer data.[11]

38.     Aetna describes in detail its privacy practices for each of its plans and emphasizes the company's commitment to complying with state and federal regulatory requirements: "We use administrative, technical and physical safeguards to keep your information from unauthorized access, and other threats and hazards to its security and integrity. We comply with all state and federal laws that apply related to the security and confidentiality of your PHI."[12]

39.     Plaintiff and the Class Members provided their PHI and PII to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep their PHI and PII confidential and secure from unauthorized access.

40.     Plaintiff and the Class Members relied on the sophistication of Defendants to keep their PHI and PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and the Class Members, who value the confidentiality of their PHI and PII and demand security to safeguard it, took reasonable steps to maintain the confidentiality of their PHI and PII.

41.     Plaintiff and the Class Members had a reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep the PHI and PII

---

[10] *Aetna*, AETNA'S PRIVACY CENTER, https://www.aetna.com/legal-notices/privacy.html#tab_content_section_responsivegrid_copy_responsivegrid_tabs_link_tabs_4.

[11] *Id.*

[12] *Aetna*, NOTICE OF PRIVACY PRACTICES, https://www.aetna.com/content/dam/aetna/pdfs/aetnacom/legal-notices/documents/health-notice-of-privacy-practices.pdf

Plaintiff and the Class Members provided confidential and secure from unauthorized access and disclosure. Defendants failed to use reasonable security procedures and practices appropriate to safeguard the sensitive information it was maintaining for Plaintiff and the Class Members, enabling and causing the exposure of their PHI and PII.

### *The Data Breach Was Preventable*

42.     The Federal Trade Commission ("FTC") has issued guidance for addressing the devastating results of data breaches and the harmful effects of an unauthorized person gaining access to someone's PHI and PII, warning: "Once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."

43.     At all times relevant to this Complaint, Defendants were aware of, or reasonably should have known, of the significance and necessity of adequately safeguarding PHI and PII and of the foreseeable consequences that would occur if its data security systems were breached.

44.     Defendants knew, or should have known, that because they collected and maintained the PHI and PII for a significant number of patients, a significant number of patients would be harmed by a breach of their systems.

45.     In spite of the widely available reports regarding cyberattacks as well as the fact that Defendants held the PHI and PII of millions of patients, they failed to use reasonable care in maintaining the privacy and security of the Plaintiff's and Class Members' PHI and PII.  If Defendants had implemented common sense security measures and adequate protection, cybercriminals could never have accessed the PHI and PII of Plaintiff and the Class Members, and the Data Breach would have either been prevented in its entirety or much smaller in scope.

46.     Defendants' negligence in safeguarding Plaintiff's and the Class Members' PHI and PII occurred in the face of repeated warnings of risks to sensitive data, as evidenced by data breach attacks in recent years. Further, as an entities in the healthcare industry, Defendants were on notice that companies in the healthcare industry are targets for data breaches.

47.     Indeed, the healthcare industry in particular has experienced a large number of high-profile cyberattacks.  More healthcare-related data breaches were reported in 2020 than in any other year, showing a 25% increase over prior years.  Additionally, according to the HIPAA Journal, the largest healthcare data breaches have been reported beginning in April 2021.

48.     In February 2022, the cybersecurity arm of the U.S. Department of Health and Human Services issued a warning to hospitals and healthcare systems about a dramatic rise in cyberattacks, including ransomware attacks, urging facilities to shore up their cyber defenses.

### *Defendants Failed to Comply with Federal Law and Regulations*

49.     Because PII is so sensitive and cyberattacks have become a rising threat, the FTC has issued numerous guides for businesses holding such sensitive PII and emphasized the importance of adequate data security practices.  The FTC also stresses that appropriately safeguarding PII held by businesses should be factored into all business-related decision making.

50.     The FTC Publication, titled "Protecting Personal Information: A Guide for Business," lays out a fundamental data security principles and standard practices that businesses should be implementing and following to protect PII.

51.     The guidelines highlight that businesses should (a) protect the personal customer information they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems.

52.     The FTC also recommends businesses use an intrusion detection system, monitor all incoming traffic to the networks for unusual activity, monitor for large amounts of data being transmitted from their systems, and have a response plan prepared in the event of a breach.

53.     The FTC also recommends that businesses limit access to sensitive PII, require complex passwords to be used on the networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

54.     Businesses that do not comply with the basic protection of sensitive PII are facing enforcement actions brought by the FTC. Failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data is an unfair act or practice prohibited pursuant to Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

55.     Defendants knew or should have known of their obligations to implement and use appropriate measures to protect patients' PHI and PII on their systems but failed to comply with the FTC's basic guidelines that would have prevented the Data Breach from occurring or made it much smaller in scope. Defendants' failure to employ appropriate measures to adequately safeguard against unauthorized access to PII constitutes an unfair act or practice as prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

56.     Moreover, Defendants' failure to adequately safeguard Plaintiff's and the Class Members' PHI is inconsistent with the standards set forth under the Health Insurance Portability and Accountability Act (HIPAA). HIPAA establishes federal standards for the protection of patients' health information. Specifically, HIPAA's Privacy Rule requires covered entities to take measures to safeguard PHI and to limit the use and disclosure of such information. The Privacy Rule's standards and requirements apply to health plans, health care clearinghouses, and

health care providers that conduct certain health care transactions electronically, which includes Defendants. By enabling Plaintiff's and the Class Members' sensitive PHI to be compromised in the Data Breach, Defendants failed to adequately comply with HIPAA's requirements.

### The Impact of the Data Breach on Victims

57.     The failure of Defendants to safeguard Plaintiff's and the Class Members' PHI and PII has severe and lasting consequences.

58.     Due to the sensitive nature of the PHI and PII accessed in the Data Breach—names, dates of birth, and Social Security numbers, and personal health information—cybercriminals can commit identity theft, financial fraud, medical fraud and other identity-related fraud against Plaintiff and the Class Members now and indefinitely.  As a result, Plaintiff and the Class Members have suffered injury and face an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach.

59.     The Data Breach exposed PHI and PII that is both valuable and highly coveted on underground markets because it can be used to commit identity theft and financial fraud.

60.     Identity thieves use such PII to, among other things, gain access to bank accounts, social media accounts, and credit cards.  Identity thieves can also use this PHI and PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government identification cards, or create "synthetic identities."

61.     Additionally, identity thieves often wait significant amounts of time—months or even years—to use the PHI and PII obtained in data breaches because victims often become less vigilant in monitoring their accounts as time passes, therefore making the PHI and PII easier to use without detection.  These identity thieves will also re-use stolen PHI and PII, resulting in

victims of one data breach suffering the effects of several cybercrimes from one instance of unauthorized access to their PHI and PII.

62.     Victims of Defendants' Data Breach face significant harm as the result of the Data Breach, including, but not limited to, identity theft and financial fraud.  Plaintiff and the Class Members are forced to spend time, money, and effort handling the consequences of the Data Breach, including purchasing credit monitoring services, reviewing financial and healthcare statements, checking credit reports, and spending time and effort searching for and responding to unauthorized activity.

63.     It is therefore unsurprising that identity theft imposes severe distress on its victims. The 2021 Identity Theft Resource Center survey exemplifies the emotional suffering weathered by victims of identity theft: 84% reported experiencing anxiety, 76% felt violated, 32% experienced financial-related identity problems, 83% reported being turned down for credit or loans, 32% reported problems with family members as a result of the breach, and 10% reported feeling suicidal after experiencing an identity theft.

64.     Identity theft can cause physical reactions as well.  The Identity Theft Resource Center survey highlighted that respondents experienced various symptoms after experiencing identity theft, including: 48.3% reported sleep disturbances; 37.1% reported an inability to concentrate or a lack of focus; 28.7% reported they were unable to go to work because of physical symptoms; 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and 12.6% reported a start or relapse into unhealthy or addictive behaviors.

65.     The unauthorized access to sensitive PHI and PII by data thieves also decreases the PHI and PII's value to its original owner.  Courts have recognized this as its own independent form of harm.[13]

66.     Identity theft victims are injured repeatedly each time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches.  The dark web is made up of several discrete repositories of stolen information that can be aggregated or accessed by different identity thieves with intentions to use each piece of information differently.  Each data breach increases the likelihood that a victim's PHI and PII will be exposed to more identity thieves.

67.     As a result of the vast array of injuries that can stem from the Data Breach, Plaintiff and the Class Members have and will continue to suffer economic loss and other actual harms for which they are entitled to damages, including, but not limited to:

     a.    The unconsented disclosure of confidential information to a third party;

     b.    Losing the inherent value of their PHI and PII;

     c.    Losing the value of access to their PHI and PII permitted by Defendants;

     d.    Identity theft and fraud resulting from the theft of their PHI and PII;

     e.    Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

     f.    Anxiety, emotional distress, and loss of privacy;

     g.    The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

---

[13] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge— the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

h.    Unauthorized charges and loss of use of and access to their accounts;

i.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

j.    Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

k.    The continued, imminent, and impending injury flowing from potential fraud and identity theft posed by their PHI and PII being in the possession of one or many unauthorized third parties.

68.    Even when an individual is reimbursed for a financial loss experienced due to identity theft or fraud, the individual will not be whole again as there is typically significant time and effort expended in seeking and obtaining reimbursement.

69.    There may also be a significant time delay between the theft of the PHI and PII and the actual misuse of the stolen information.  When conducting a study regarding data breaches, the Government Accountability Office stated: "law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."

70.    Reporting on a global consumer survey regarding concerns about privacy and data security, the American Bankers Association noted that 29% of consumers would avoid using a company that had experienced a data breach in the past.  The same report notes that 63% of consumers also indicated they would avoid such a company for a period of time.

71.     Plaintiff and the Class Members have an interest in Defendants' promises and obligations to safeguard the PHI and PII that Plaintiff and the Class Members entrusted to Defendants.  Defendants' failure to live up to its promises and duties in this respect caused Plaintiff and Class Members to seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Defendants' wrongful conduct.

72.     Through this remedy, Plaintiff seeks to restore himself and Class Members as close to the same position as they would have been in but for Defendants' wrongful conduct, specifically, their failure to appropriately and adequately safeguard Plaintiff's and the Class Members' PHI and PII.

73.     Plaintiff and the Class Members further seek to recover the value of the unauthorized access to their PHI and PII permitted through Defendants' wrongful conduct.

74.     This measure of damages is analogous to the remedies for unauthorized use of intellectual property.  Similar to a technology covered by a trade secret or patent, use or access to an individual's PHI and PII is non-rivalrous—the unauthorized use by another does not diminish the original owner's ability to practice the patented invention or use trade secret-protected technology.  Nevertheless, plaintiffs may generally recover the reasonable value of use of the intellectual property, or a "reasonable royalty" from an infringer.  This is true even though the infringer's use did not interfere with the original owner's own use and even though the owner would not have otherwise licensed such intellectual property to the infringer.

75.     A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value.  This measure is appropriate because (a) Plaintiff and Class Members have protectible property interest in their

PHI and PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

76.     Defendants' failure to send prompt notice of the Data Breach also resulted in harm to Plaintiff and Class Members.  The notice Plaintiff and the Class Members received contained no explanation of the precise nature of the Data Breach; the identity of the cybercriminal; and failed to disclose the full scope of compromised information. Defendants' choice to withhold these essential pieces of information is significant because Class Members may take varying precautions depending on the sensitivity level of information taken and the imminence of the perceived risk.  By downplaying the risk of misuse of the PHI and PII and delaying notice by more than two months, Defendants prevented Plaintiff and the Class Members from taking meaningful, proactive, and targeted mitigation measures to secure their PHI, PII, and accounts.

77.     Plaintiff and the Class Members have an interest in ensuring that their PHI and PII is adequately safeguarded and not vulnerable to further attacks because Defendants continue to hold their information.

## CLASS ACTION ALLEGATIONS

78.     Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of the following nationwide class (the "Nationwide Class" or the "Class"):

> **All individuals NationsBenefits identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach.**

79.     The Class asserts claims against Defendants for negligence (Count I), unjust

enrichment (Count II), invasion of privacy (Count III), third-party beneficiary breach of contract

(Count IV), bailment (Count V), and breach of fiduciary duty (Count VI).

80.     Specifically excluded from the Nationwide Class are Defendants' officers,

directors, or employees; any entity in which Defendants have a controlling interest; and any

affiliate, legal representative, heir or assign of Defendants.  Also excluded from the Class are any

federal, state, or local governmental entities, any judicial officer presiding over this action and

the members of their immediate families and judicial staff, and any juror assigned to this action.

81.     **Jurisdictional Amount.**  As alleged herein, Plaintiff seeks damages on behalf of

himself and the more than one million putative Class Members, satisfying the $5 million

jurisdictional requirement of 28 U.S.C. § 1332(d)(2).

82.     **Ascertainability.**  The members of the Class are readily identifiable and

ascertainable. NationsBenefits and/or its affiliates, among others, possess the information to

identify and contact Class Members.

83.     **Numerosity.**  The members of the Class are so numerous that joinder of all

members' claims is impracticable. NationsBenefits' statements reveal that the Class contains

over three million persons whose PHI and PII was compromised in the Data Breach.

84.     **Typicality.**  Plaintiff's claims are typical of the claims of other members of the

Class, in that Plaintiff and Class Members sustained damages arising out of the same acts and

omissions of NationsBenefits relating to its failure to protect, oversee, monitor, and safeguard the

PHI and PII of the Class.

85.     **Adequacy of Representation.**  Plaintiff will fairly and adequately represent and

protect the interests of other members of the Class.  Plaintiff's claims are made in a

representative capacity on behalf of the other members of the Class.  Plaintiff has no interests

antagonistic to the interests of the other members of the Class and are subject to no unique

defenses.  Plaintiff has retained competent counsel to prosecute the case on behalf of themselves

and the Class.  Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this

action on behalf of the members of the Class and have the financial resources to do so.

86.    **Policies Generally Applicable to the Class.**  This class action is appropriate for

certification because Defendants have acted or refused to act on grounds generally applicable to

the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure

compatible standards of conduct toward Class Members and making final injunctive relief

appropriate with respect to the Class as a whole. Defendants' practices challenged herein apply

to and affect Class Members uniformly, and Plaintiff's challenge to those practices hinges on

Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to

Plaintiff.

87.    **Commonality and Predominance.**  There are many questions of law and fact

common to the claims of Plaintiff and the Class Members, and those questions predominate over

any questions that may affect individual Class Members.  Common questions for the Class

include, but are not necessarily limited to, the following:

      a.    Whether Defendants owe Plaintiff and the Class Members a duty to implement and maintain reasonable security procedures and practices to protect their PHI and PII;

      b.    Whether Defendants acted negligently in connection with the monitoring and/or protection of Plaintiff's and the Class Members' PHI and PII;

      c.    Whether Defendants violated their duty to implement reasonable security systems to protect Plaintiff's and the Class Members' PHI and PII;

      d.      Whether Defendants' breach of its duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiff and the Class Members;

      e.      Whether Defendants provided timely notice of the Data Breach to Plaintiff and the Class Members; and

      f.      Whether Plaintiff and the Class Members are entitled to compensatory damages, punitive damages, and/or nominal damages as a result of the Data Breach.

88. Defendants have engaged in a common course of conduct, and Plaintiff and the Class Members have been similarly impacted by Defendants' failure to maintain adequate security procedures and practices to protect patients' PHI and PII, as well as Defendants' failure to timely alert affected patients to the Data Breach.

89. **Superiority.** This case is appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small in comparison to the burden and expense of individual prosecutions of litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties and the court systems of many states and federal districts. By contract, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

## CAUSES OF ACTION

### COUNT I
**Negligence**
***(On Behalf of Plaintiff and the Class)***

90.     Plaintiff incorporates all previous allegations set forth above.

91.     Defendants owed a duty to Plaintiff and the Class Members to notify them that

their PHI and PII had been disclosed to and accessed by unauthorized criminal hackers.

92.     Defendants owed a duty to Plaintiff and Class members to properly train, vet, and

oversee employees and vendors who maintain, access, store, and manage Plaintiff's and Class

Members' PHI and PII and to implement and maintain reasonable data security practices to

protect their PHI and PII from foreseeable cyberattacks and unauthorized access.

93.     Defendants breached these duties and the applicable standards of care by:

a.     Failing to conduct proper and reasonable training and due diligence over
vendors and employees and data security systems, practices, and
procedures;

b.     Failing to conduct proper and reasonable due diligence over the
employees, vendors, or contractors that were the vector(s) of and/or
facilitated the hackers' infiltration into the system(s) storing Plaintiff's and
the Class Members' PHI and PII;

c.     Failing to maintain reasonable and appropriate oversight and audits on its
internal data security and its employees, vendors, or contractors that were
the vectors of the hackers' infiltration into the system(s) storing Plaintiff's
and the Class Members' PHI and PII;

d.     Failing to adequately segregate and isolate patient information from
publicly accessible or publicly adjacent environments;

e.     Failing to implement and maintain reasonable safeguards and procedures
to prevent the unauthorized disclosure of Plaintiff's and the Class
Members' PHI and PII;

f.     Failing to monitor and detect its confidential and sensitive data
environment(s) storing Plaintiff's and the Class Members' PHI and PII
reasonably and appropriately in order to repel or limit the Data Breach;

g.   Failing to implement and maintain reasonable data storage and retention procedures with respect to the PHI and PII to ensure the PHI and PII was being stored and maintained for legitimate and useful purposes;

h.   Failing to undertake reasonable and sufficient incident response measures to ensure that the attack directed toward Defendants' sensitive business information would not expose and cause disclosure and unauthorized acquisition of Plaintiff's and the Class Members' PHI and PII;

i.   Failing to ensure that any and all unauthorized copies of accessed data, including Plaintiff's and the Class Members' PHI and PII was deleted, destroyed, rendered unable to be used, or returned to Plaintiff and the Class Members;

j.   Failing to reasonably conduct forensic investigation into the scope, nature, and exposure of the Data Breach or to ascertain its full severity;

k.   Failing to provide full disclosure, deceptively misleading consumers through false representations and misleading omissions of facts regarding the Data Breach, consumers' risk and exposure caused by the Data Breach, and the adequacy of the investigation of and response to the Data Breach; and

l.   Failing to provide accurate, complete, and sufficiently detailed notification to Plaintiff and the Class Members regarding the circumstances of the Data Breach, its causes, its effects, the extent of the exposure of the PHI and PII, and details regarding the disposition of Plaintiff's and the Class Members' PHI and PII at all times during the Data Breach.

94.   Defendants are both the actual and legal cause of Plaintiff's and Class Members' injuries.  Had Defendants adopted and maintained reasonable data security procedures and provided timely notification of the Data Breach to those affected, including Plaintiff and the Class, Plaintiff and other Class Members would not have been damaged or would have been damaged to a lesser degree than they actually were.

95.   Plaintiff and Class Members have suffered damages as a result of Defendants' negligence.  Plaintiff and Class Members have suffered actual and concrete injuries and will suffer additional injuries into the future, including economic and non-economic damages in the following forms: (a) invasion of privacy; (b) financial costs incurred mitigating the imminent

risk of identity theft; (c) loss of time and loss of productivity incurred mitigating the imminent

risk of identity theft; (d) loss of time and loss of productivity by heeding Defendants' warnings

and following its instructions on the notices; (e) financial costs incurred due to actual identity

theft; (f) the cost of future identity theft monitoring; (g) loss of time incurred due to actual

identity theft; and (h) diminution of value of their PHI and PII.

**COUNT II**
**Unjust Enrichment**
***(On Behalf of Plaintiff and the Class)***

96.     Plaintiff incorporates all previous allegations set forth above.

97.     Plaintiff and Class Members have both an equitable and legal interest in their PHI

and PII that was conferred upon, collected by, used by, and maintained by Defendants and that

was ultimately stolen in the Data Breach.

98.     Defendants benefited by the conferral upon it of the PHI and PII pertaining to

Plaintiff and Class Members and by its ability to retain, use, and profit from that information.

Defendants understood and valued this benefit.

99.     Defendants also understood and appreciated that the PHI and PII pertaining to

Plaintiff and Class Members was private and confidential, and its value depended upon

Defendants maintaining the privacy and confidentiality of such PHI and PII.

100.     Without Defendants' willingness and commitment to maintain the privacy and

confidentiality of the PHI and PII, that PHI and PII would never have been entrusted to

Defendants. If Defendants had disclosed that its data security practices were inadequate, it would

not have been permitted to continue in operation by regulators or its clients.

101.     Because of Defendants' use of Plaintiff's and the Class Members' PHI and PII,

Defendants sold more services and products than it otherwise would have.  Defendants were

unjustly enriched by profiting from the additional services and products they were able to market, sell and create, to the detriment of Plaintiff and Class Members.

102.    Defendants also benefitted through their unjust conduct by retaining money that they should have used to provide reasonable and adequate data security to protect Plaintiff's and Class Members' PHI and PII.

103.    Defendants also benefitted through their unjust conduct in the form of profits they gained through the use of Plaintiff's and Class Members' PHI and PII.

104.    It is inequitable for Defendants to retain these benefits.

105.    As a result of Defendants' wrongful conduct as alleged in this Complaint—including, among other things, their failure to employ adequate data security measures, their continued maintenance and use of the PHI and PII belonging to Plaintiff and the Class Members without having adequate data security measures and their other conduct facilitating the theft of the PHI and PII—Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class Members.

106.    Defendants' unjust enrichment is traceable to and resulted directly and proximately from the conduct alleged herein, including the compiling and use of Plaintiff's and the Class Members' sensitive PHI and PII, while at the same time failing to maintain that information securely and protected from intrusion and theft by hackers and identity thieves.

107.    It is inequitable, unfair, and unjust for Defendants to retain these wrongfully obtained benefits. Defendants' retention of wrongfully obtained monies violates fundamental principles of justice, equity, and good conscience.

108.    The benefit conferred upon, received, and enjoyed by Defendants was not conferred gratuitously, and it would be inequitable, unfair, and unjust for them to retain the benefit.

109.    Defendants' inadequate security and their unfair and deceptive conduct have, among other things, caused Plaintiff and the Class Members to unfairly incur substantial time and/or costs mitigating and monitoring the use of their PHI and PII and have caused Plaintiff and the Class Members other damages as described herein.

110.    Plaintiff and the Class Members have no adequate remedy at law.

111.    Defendants are therefore liable to Plaintiff and the Class Members for restitution or disgorgement in the amount of the benefit conferred on Defendants as a result of their wrongful conduct, including specifically: the value to Defendants of the PHI and PII that was stolen in the Data Breach; the profits Defendants have received and are receiving from the use of that information; and the amounts that Defendants should have spent to provide reasonable and adequate data security to protect Plaintiff's and the Class Members' PHI and PII.

## COUNT III
### Invasion of Privacy
### *(On Behalf of Plaintiff and the Class)*

112.    Plaintiff incorporates all previous allegations set forth above.

113.    Plaintiff and Class Members shared PHI and PII with Defendants and/or its affiliates that Plaintiff and Class Members wanted to remain private and non-public.

114.    Plaintiff and Class Members reasonably expected that the PHI and PII they shared with Defendants would be protected and secured against access by unauthorized parties and would not be disclosed to or obtained by unauthorized parties or disclosed or obtained for any improper purpose.

115.     Defendants intentionally intruded into Plaintiff's and Class Members' seclusion by disclosing, without permission, their PHI and PII to a criminal third party.

116.     By failing to keep Plaintiff's and the Class Members' PHI and PII secure, and disclosing PHI and PII to unauthorized parties for unauthorized use, Defendants unlawfully invaded Plaintiff's and the Class Members' privacy right to seclusion by, *inter alia*:

      a.     Intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

      b.     Invading their privacy by improperly using their PHI and PII properly obtained for another purpose, or disclosing it to unauthorized persons;

      c.     Failing to adequately secure their PHI and PII from disclosure to unauthorized persons; and

      d.     Enabling the disclosures of their PHI and PII without consent.

117.     The PHI and PII that was compromised during the Data Breach was highly sensitive, private and confidential, as it included Social Security numbers and other information that is the type of sensitive, personal information that one normally expects will be protected from exposure by the entity charged with safeguarding it.

118.     Defendants' intrusions into Plaintiff's and the Class Members' seclusion were substantial and would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

119.     As a direct and proximate result of Defendants' invasion of privacy, Plaintiff and the Class Members suffered injury and sustained actual losses and damages as alleged herein. Plaintiff and the Class Members alternatively seek an award of nominal damages.

**<u>COUNT IV</u>**
**THIRD-PARTY BENEFICIARY BREACH OF CONTRACT**
***(On Behalf of Plaintiff and the Class)***

120.     Plaintiff incorporates all previous allegations set forth above.

121.    Acting in the ordinary course of its business, NationsBenefits entered into contracts with health insurance providers and electronic health records software and practice management systems.

122.    On information and belief, those respective contracts contained provisions requiring NationsBenefits to protect the PHI and PII that NationsBenefits received in order to provide services in turn to the healthcare providers.

123.    On information and belief, those provisions requiring NationsBenefits acting in its ordinary course of business to protect PHI and PII of the healthcare providers' patients were intentionally included for the direct benefit of Plaintiff and the Class Members, such that Plaintiff and Class Members are intended third-party beneficiaries of these contracts and are therefore entitled to enforce them.

124.    NationsBenefits breached these contracts while acting in the course of its ordinary business by not safeguarding Plaintiff's and the Class Members' PHI and PII, as described herein.

125.    As a direct and proximate result of NationsBenefits' breaches, Plaintiff and the Class Members sustained actual losses and damages as described in detail herein. Plaintiff and the Class Members alternatively seek an award of nominal damages.

**COUNT V**
**Bailment**
***(On Behalf of Plaintiff and the Class)***

126.    Plaintiffs incorporates all previous allegations set forth above.

127.    Plaintiff and the Class Members provided their PHI and PII to Defendants—either directly or through business affiliates—which Defendants were under a duty to keep private and confidential.

128.     Plaintiff and the Class Members' PHI and PII is personal property, and it was conveyed to Defendants for the certain purpose of keeping the information private and confidential.

129.     Plaintiff and the Class Members' PHI and PII has value, and it is highly prized by hackers and cybercriminals.  Defendants were aware of the risks they took when accepting Plaintiff's and the Class Members' PHI and PII for safeguarding, and it assumed the risk voluntarily.

130.     Once Defendants accepted Plaintiff's and the Class Members' PHI and PII, they were in the exclusive possession of that PHI and PII, and neither Plaintiff nor Class Members could control that information once it was within Defendants' possession, custody, and control.

131.     Defendants did not safeguard Plaintiff's or the Class Members' PHI and PII when they failed to adopt and enforce adequate security safeguards to prevent a known risk of cyberattack.

132.     Defendants' failure to safeguard Plaintiff's and the Class Members' PHI and PII resulted in their information being accessed or obtained by third-party cybercriminals.

133.     As a result of Defendants' failure to keep Plaintiff's and the Class Members' PHI and PII secure, Plaintiff and the Class Members suffered injury, for which compensation—including nominal damages and compensatory damages—are appropriate.

**COUNT VI**
**Breach of Fiduciary Duty**
***(On Behalf of Plaintiff and the Class)***

134.     Plaintiff incorporates all previous allegations set forth above.

135.     In light of the special relationship between Defendants, Plaintiff and Class Members, Defendants became a fiduciary by undertaking a guardianship of the PHI and PII to

act primarily for Plaintiff and the Class Members (1) for the safeguarding of Plaintiff's and the

Class Members' PHI and PII; (2) to timely notify Plaintiff and the Class Members of a data

breach and disclosure; and (3) to maintain complete and accurate records of what information

(and where) Defendants store.

136.    Defendants had a fiduciary duty to act for the benefit of Plaintiff and the Class

Members upon matters within the scope of their relationship with their members and customers,

in particular, to keep their PHI and PII secure.

137.    Defendants breached their fiduciary duties to Plaintiff and Class Members by

failing to encrypt and otherwise protect the integrity of the systems containing their PHI and PII.

138.    Defendants breached their fiduciary duties to Plaintiff and the Class Members by

otherwise failing to safeguard Plaintiff's and the Class Members' PHI and PII.

139.    As a direct and proximate result of Defendants' breach of their fiduciary duties,

Plaintiff and the Class Members have suffered and will suffer injury, including but not limited to:

(i) actual identity theft; (ii) the compromise, publication, and/or theft of their PHI and PII; (iii)

out-of-pocket expenses associated with the prevention, detection, and recovery from identity

theft and/or unauthorized use of their PHI and PII; (iv) lost opportunity costs associated with the

effort expended and loss of productivity due to addressing and attempting to mitigate the actual

and future consequences of the Data Breach, including but not limited to efforts spent

researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk

to their and PHI and PII, which remains in Defendants' possession and is vulnerable to further

unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate

measures to protect the PHI and PII in their continued possession, (vi) future costs in terms of

time, effort, and money that will be expended as a result of the Data Breach for the remainder of

the lives of Plaintiff and Class Members, and (vii) the diminished value of Defendants' services received by Plaintiff and Class Members.

140.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and the Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class set forth herein, respectfully requests the following relief:

A.    That the Court certify this action as a class action and appoint Plaintiff and his counsel to represent the Class;

B.    That the Court grant permanent injunctive relief to prohibit and prevent Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.    That the Court award Plaintiff and the Class Members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D.    That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

E.    That the Court award to Plaintiff and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

F.    That the Court award pre- and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

**MILLER SHAH LLP**

Dated: July 18, 2023          By:      */s/ Nathan C. Zipperian*
                                       Nathan C. Zipperian
                                       1625 N. Commerce Parkway
                                       Suite 320
                                       Fort Lauderdale, Florida 33326
                                       Telephone: (866) 544-5505
                                       Facsimile: (866) 300-7367
                                       nczipperian@millershah.com

                                       Robert C. Schubert (*pro hac vice* to be filed)
                                       Amber L. Schubert (*pro hac vice* to be filed)
                                       **SCHUBERT JONCKHEER & KOLBE LLP**
                                       2001 Union Street, Suite 200
                                       San Francisco, California 94123
                                       Telephone: (415) 788-4220
                                       Facsimile: (415) 788-0161
                                       rschubert@sjk.law
                                       aschubert@sjk.law

                                       *Attorneys for Plaintiff and the Putative Class*